## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MIA MASON,
371 Monticello Ct, Glen Burnie, Maryland
21061, Baltimore County, individually, and on
behalf of all others similarly situated,

         *Plaintiff*,


    *v.*


MACHINE ZONE, INC.,
555 Hamilton Avenue, Palo Alto, California
94301, a Delaware corporation,

         *Defendant*.

Case No.:

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Mia Mason brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Machine Zone, Inc. to recover gambling losses incurred through its electronic casino. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF ACTION

1.      Defendant Machine Zone operates the popular Game of War videogame, which is available on Android and Apple iOS devices. Players download the game onto their mobile devices, create virtual towns and armies, and battle other Game of War players.

2.      While the game is free to play, Machine Zone sells "Gold" and "Chips" within the game, starting at the price of $4.99 for 1,200 Gold. While players can use Gold to improve their virtual towns

and hasten their advancement in the game, these benign uses of Gold merely obfuscate the unlawful game of chance Machine Zone operates within Game of War. In this game of chance—appropriately named the "Casino"—players routinely wager hundreds of dollars for the chance of winning valuable prizes.

3.      Players that win the most valuable prizes can then "cash out" by listing their Game of War accounts on the secondary market, with the cash value of accounts rising commensurate with the value of awarded prizes. Game of War accounts listed at online auction sites regularly sell for hundreds of dollars.

4.      Unfortunately, thousands of consumers across the country have lost—and Defendant has won—millions of dollars through Defendant's Game of War Casino. Accordingly, Mia Mason, on her own behalf and on behalf of a class of similarly situated individuals, brings this lawsuit to recover the ill-gotten gains, statutory damages and losses where applicable, as well as costs and attorneys' fees.

## PARTIES

5.      Plaintiff Mia Mason is a natural person and citizen of the State of Maryland.

6.      Defendant Machine Zone, Inc. is a corporation existing under the laws of the State of Delaware, with its principal place of business located at 555 Hamilton Avenue, Palo Alto, California 94301. Machine Zone conducts business in the State of Maryland, this District, and nationwide.

## JURISDICTION AND VENUE

7.      Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative Class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

8.     The Court has personal jurisdiction over Defendant because Defendant conducts significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and because Defendant conducts business in this District and entered into contracts in this District.

## COMMON FACTUAL ALLEGATIONS

**I.     Free-to-Play and the New Era of Online Gambling.**

10.     The proliferation of internet-connected mobile devices has led to the growth of so-called "free-to-play" videogames. With free-to-play games, developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

11.     The free-to-play model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, among others) because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue and are expected to grow to over $2.4 billion by the end of 2015.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

12.     With free-to-play games of chance, developers have begun exploiting the same

---

[1]     VentureBeat, *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat | Games | by Dean Takahashi*, http://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Apr. 10, 2015).

[2]     *Id.*

psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some . . . the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

13.    Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

14.    The comparison to casinos doesn't end there. Just as with casino operators, free-to-play

developers rely on a small portion of their players to provide the majority of their profits. These

"whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over

50% of mobile game revenue."[5]

15.    Game Informer, another respected videogame magazine, reported on the rise (and

danger) of micro-transactions in free-to-play games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability

---

[3]      PC Gamer, *Microtransactions: the good, the bad and the ugly*,
http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 10, 2015).

[4]      The Badger, *Are micro-transactions ruining video games? | The Badger*,
http://www.badgeronline.co.uk/micro-transactions-ruining-video-games/ (last visited Apr. 10, 2015).

[5]      *Id.* (emphasis added).

model governs casino gambling."[6]

16.    Academics have also studied the socioeconomic effect free-to-play games have on

consumers. In one study, the authors compiled several sources analyzing free-to-play games of chance

(called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar
> sociodemographic characteristics (*e.g.*, employment, education, income) with online
> gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of
> online gambling is engagement in [free-to-play] casino games. Putting a dark line under
> these findings, over half (58.3%) of disordered gamblers who were seeking treatment
> stated that social casino games were their first experiences with gambling."

> . . .

> "According to [another study], the purchase of virtual credits or virtual items makes the
> activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-
> transactions may be a crucial predictor in the migration to online gambling, as these
> players have now crossed a line by paying to engage in these activities. Although, [sic]
> only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase
> virtual credits spend an average of $78. Despite the limited numbers of social casino
> gamers purchasing virtual credits, revenues from micro-transactions account for 60 %
> [sic] of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is
> based on players' desire to purchase virtual credits above and beyond what is provided to
> the player in seed credits."[7]

17.    The same authors looked at the link between playing free-to-play games of chance and

gambling in casinos. They stated that "[prior] research indicated that winning large sums of virtual

credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling,"

---

[6]     Game Informer, *How Microtransactions Are Bad For Gaming - Features -
www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-
microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited Apr. 10,
2015).

[7]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online
Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-
sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and
Commercial Gaming (Nov. 14, 2014), *available at*
http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

18.     The similarity between free-to-play games of chance and games of chance found in casinos has caused governments across the world to intervene and limit their availability.[9] For example, a member of the Belgian Gaming Commission recently decried Game of War's Casino as illegal gambling, stating that Machine Zone was targeting underage consumers and encouraging them to gamble due to the "casino elements" within the game.[10] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendant's Game of War Casino has thrived and thousands of consumers have lost millions of dollars by unwittingly gambling in Defendant's unlawful game of chance.

## II.     Defendant's Game of War and its Virtual Casino.

19.     Machine Zone operates the popular Game of War videogame that is available on Android (*e.g.*, Samsung Galaxy S) and iOS (*e.g.*, Apple iPhone) devices. Consumers download the game for free by visiting the Google Play or the Apple App store. Once the game is installed, consumers begin playing

---

[8]      *Id.* (emphasis added).

[9]      In late August 2014, South Korea began regulating "social gambling" games, including games similar to Game of War, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, www.pokernews.com/ news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Apr. 10, 2015). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

[10]     *Belgian Regulator Denounces Game of War: Fire Age as "Illegal Gambling"*, http://www.casino.org/news/belgian-regulator-denounces-game-war-fire-age-illegal-gambling (last visited Apr. 10, 2015).

by opening the game and running through a tutorial created by Machine Zone aimed to familiarize consumers with the game's mechanics.

20.     Although the game is free-to-play, one of the primary methods by which Defendant generates revenue is selling in-game "Gold" to consumers. Prices start at $4.99 for 1,200 Gold. Since early 2014, Machine Zone has generated over $600 million in revenue, in part, by selling Gold and Chips.

21.     Once consumers purchase Gold, they are able to buy "Chips" at the game's "Casino." Defendant's aptly named Casino, though, is nothing more than an illegal game of chance camouflaged as a benign videogame.

*A.     Defendant's Game of War Casino and its Spinning Wheel of Chance.*

22.     Within Game of War, Machine Zone has created a virtual Casino where the only purpose is to engage in a game of chance. The first time consumers visit the Casino, Defendant gives them a free "spin" of the wheel. (*See* <u>Figure 1</u>.)



(**Figure 1.**)

23.     After their initial visit, consumers have to wager a minimum of 5,000 Chips for each

spin. (*See* Figure 2, on the following page.) If consumers do not have enough Chips to spin the Wheel,

Machine Zone informs them that they must "Get & Use" Chips by buying them for 200 Gold. (*Id.*)

Defendant then directs consumers to its "Gold Store to purchase more" via a pop-up screen. (*Id.*)

 

(**Figure 2.**)

24.     At its Gold Store, Defendant sells Gold at prices starting at $4.99 for 1,200 Gold and at a

maximum of $99.99 for 20,000 Gold. (*See* Figure 3.)

 

(**Figure 3.**)

25. Once the consumers have purchased the Gold[11], they can return to the Casino to exchange their Gold for Chips to use at Defendant's game of chance.

B. *Defendant Accepts Wagers for a Spin and Awards Prizes.*

26. Defendant's Casino is not unlike the popular spinning wheel games found at traditional casinos (*e.g.*, "Big Six Wheel" or "Wheel of Fortune"). For its version of the spinning wheel, Defendant encourages consumers to "PLAY" by wagering 5,000 Chips (approximately $0.60) to spin the wheel. (*See* Figure 4, showing the cost of one "PLAY" or spin as "5,000" Chips, or $0.60). Defendant also developed a "HIGH ROLLER MODE" that can be activated (at a price) to increase the wager while making "bonus items" available as prizes.



(**Figure 4.**)

27. When the consumer spins the wheel, Defendant uses an animated light to indicate a "spin." The animated light then rotates around the wheel and stops after several seconds. The consumer is awarded whatever prize the animated light lands on. (*See* Figure 5 on the following page, showing

---

[11] In an effort to boost sales of Chips and Gold (and without disclosing this fact), Defendant only lets players purchase packages at prices equal to or higher than price of the previous package the consumer purchased. For example, if a consumer purchased packages at $4.99, then $4.99, and then $9.99, Defendant won't offer that consumer any packages less than $9.99 going forward.

that the player won "10,000" additional casino chips, worth approximately $1.20.)



(**Figure 5.**)

28.     The prizes Defendant awards vary in value from "resources" that can be used to advance game play (*e.g.*, wood or stone) to high-value items such as additional Casino Chips or Gold.

29.     Similar to traditional spinning wheels found in casinos, consumers do not have any ability to control what prizes Defendant awards upon a spin.[12] After pressing the button to spin the wheel, Defendant does not accept any input or action until it awards the prize—no skill on the part of the consumer affects the outcome of a spin.

30.     The outcome of a spin depends entirely on the rules Defendant has programmed into the Game of War Casino. Defendant programmed the rules that determine, for example, how much consumers can wager, how the wagers are deducted from accounts, how long each spin takes, how the

---

[12]     While the consumer does not have a choice as to the specific prize they are awarded by the spinning wheel, there are instances where Defendant's prize is a play at another game of chance. In those cases, for example, Defendant will present three closed "treasure chests" to the consumer that contain (hidden) items of varying value. The consumer is allowed to open one chest to discover and keep whatever it contains. Like the spinning wheel, the contents of the chests range from in-game resources to additional Chips or Gold.

spin is animated, the odds of winning each type of prize, and how the prize is presented and credited to the consumer. Moreover, Defendant maintains detailed records showing transaction details, such as when players purchase Gold and/or convert Gold to Chips.

       C.     *Consumers Have Lost (and Defendant Has Won) Real Money in the Casino.*

      31.     The Casino is an integral part of Defendant's Game of War. Defendant advertises the Casino to consumers within the game and has tied usage of the Casino to in-game advancement. By design, all players of Game of War have undoubtedly spun the wheel at the Casino. And once Defendant has gotten a consumer's foot in the Casino door, Defendant does its best to encourage consumers to wager Chips that have been purchased with cash.

      32.     In one report, a child who played Game of War lost over €25,000 (approximately $27,000) of his parents' money by playing Game of War and wagering at the Casino.[13]

      33.     The allure of the Casino, naturally, is that consumers have the chance of winning prizes that are valued higher than their initial wagers. Knowing this, Defendant populated the possible outcomes with prizes such as Chips that grant additional spins of the wheel and "treasure chests" that might be filled with Gold.

      34.     Recently, in an effort to uncover the odds of winning various prizes, an individual that regularly plays in the Casino compiled the results of over 1,000 individual spins. These results, shown in Figure 6, shed light on the odds Defendant programmed each spin to win each prize.

---

[13]    *Belgian Regulator Denounces Game of War: Fire Age as "Illegal Gambling"*, http://www.casino.org/news/belgian-regulator-denounces-game-war-fire-age-illegal-gambling (last visited Apr. 10, 2015).

| | Spins | Basic Items | Chests | Chests With Gold | Free Chips |
|---|---|---|---|---|---|
| Total Spins | 1098 | 843 | 178 | 47 | 77 |
| Total Percent | 100% | 76.78% | 16.21% | 26.40% | 7.01% |

(**Figure 6.**)[14]

35.     The results also show consumers' expected cost of obtaining each prize, which is also equal to Defendant's expected revenue by offering each prize. (*See* Figure 7.)

| | Basic Item | Chests | Chests With Gold | Free Chips |
|---|---|---|---|---|
| **Expected Cost** | $0.77 | $4.95 | $13.78 | $8.41 |

(**Figure 7.**)[15]

36.     As the figures above show, Defendant programmed the odds to favor the award of "basic items" on a spin while disfavoring the award of chests, Gold, and Chips. Defendant programmed the odds in that way because it knows that consumers will pay a little money up front for the *chance* at receiving an otherwise expensive item. By design, then, Defendant has made millions selling Chips and Gold that are used to wager at its Casino.

D.     *The Secondary Market for Game of War Accounts.*

37.     The prizes Defendant awards after spinning are valuable to Machine Zone and players alike. Machine Zone makes millions of dollars by selling Gold and Chips to consumers within the Game of War videogame, and to cash out, players have created secondary markets to buy and sell Game of War accounts.

---

[14]     *What are the odd's - Casino | GOWFA Central*, http://www.gowfacentral.com/what-are-the-odds-casino/ (last visited Apr. 10, 2015).

[15]     Expected cost was calculated by multiplying the approximate cost per spin of $0.60 by the odds of winning identified in Figure 6.

38.     Specifically, when players win big at the Casino, they can cash out by selling their accounts online. For example, Game of War accounts are regularly listed for sale on traditional auction websites, such as nonparty eBay, Inc., for $500 or more. Accounts containing a high amount of Gold and Chips fetch higher prices.[16]

39.     Similarly, players routinely list accounts for sale at PlayerAuctions.com where the prices rise commensurate with the amount of Gold in the account.[17] As such, players' account values will increase with the amount of Gold that is won through Defendant's Casino.

40.     Thousands of players have also joined together to create a Facebook community that is self-described as the "Largest Game of War Account Trading Community on Facebook. Here you can Buy, Sell, and Trade GoW Accounts."[18]

41.     And on www.PlayerUp.com—the "worlds [*sic*] most secure player 2 player account marketplace"—over 2,900 users have listed their Game of War accounts for sale. (*See* Figure 8.) Many of the consumers selling their accounts have asked prices well over $1,000. (*See id.*)

---

[16]     *Game of war accounts | eBay*,
http://www.ebay.com/sch/i.html?_from=R40&_trksid=p2050601.m570.
l1313.TR0.TRC0.H0.Xgame+of+war+accounts.TRS0&_nkw=game+of+war+accounts&ghostText=&_sacat=0 (last visited Apr. 10, 2015).

[17]     *Buy Game of War Account with Mil power and lot more offer! | PlayerAuctions*,
http://www.playerauctions.com/game-of-war-account/ (last visited Apr. 10, 2015).

[18]     *Game of War Accounts - Buy and Sell | Facebook*,
https://www.facebook.com/gameofwaraccounts (last visited Apr. 10, 2015).



(**Figure 8.**)

42.     On information and belief, Defendant is fully aware of the existence of this secondary market and the manner in which its customers use it.

## PLAINTIFF MASON'S EXPERIENCE

43.     In early 2014, Plaintiff Mason downloaded Game of War onto her mobile device and began playing the game. Soon after, she began playing in the Casino where she wagered complimentary Chips for a chance to win a prize. After she exhausted her complimentary Chips, Plaintiff Mason began purchasing more Chips by buying Gold in increments of at least $4.99. Thereafter, and up until January 2015, Plaintiff Mason continued to purchase Chips and Gold so that she could wager Chips for a chance at winning a prize in Defendant's Casino. In total, from early 2014 to January 2015, Plaintiff has lost more than $100 wagering at Defendant's Casino.

## CLASS ALLEGATIONS

44.     **Class Definitions**: Plaintiff Mason brings this action pursuant to Fed. R. Civ. P. 23(b)(3)

on behalf of herself and a Class and Subclass of similarly situated individuals, defined as follows:

> **Class**: All persons in the United States who purchased Chips from Defendant and lost the Chips by wagering at Defendant's Game of War Casino.[19]

> **Subclass**: All Class members who are residents of Maryland that lost money at Defendant's Game of War Casino.

Excluded from the "Class" and "Subclass" (collectively referred to as the "Class," unless otherwise indicated) are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

45.     **Numerosity**: The exact number of the members of the Class and Subclass is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, tens of thousands of consumers fall into the definition of the Class, with thousands of those consumers residing in Maryland. Members of the Class and Subclass can be identified through Defendant's records.

46.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiff's and the Class's claims, and those questions predominate over any questions that may affect

---

[19]     Defendant's "Terms of Service," a true and accurate copy is attached hereto as <u>Exhibit A</u>, state under the heading "(c) Controlling Law and Jurisdiction" that "These Terms and any action related thereto will be governed by the laws of the State of California without regard to its conflict of law provisions."

individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

      a.      Whether Defendant's Game of War is an unlawful gambling device as defined by Cal. Penal Code § 330b;

      b.      Whether Defendant's conduct violates Cal. Civ. Code §§ 17200 *et seq.*;

      c.      Whether Defendant has been unjustly enriched; and

      d.      Whether Defendant's Game of War is a gambling device as defined by Maryland Code Criminal Law Section 12-101.

47.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class, in that Plaintiff and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

48.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class. That is, Plaintiff and each member of the Class lost money playing Defendant's game of chance. Plaintiff also has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the Class.

49.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of

conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiff challenges apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same.

50.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of individual prosecution of litigation to redress Defendant's actions. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

51.     Plaintiff reserves the right to revise the "Class Allegations" and "Class Definitions" based on facts learned through additional investigation and discovery.

**COUNT I**
**Violation of Cal. Penal Code § 330b**
**(On Behalf of Plaintiff and the Class)**

52.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

17

53.     Defendant's Game of War Casino is a "slot machine or device" within the meaning of Cal. Penal Code § 330b(d) because it is a machine, apparatus, or device that has been adapted for use in a way that is operated through the insertion of money by electronic means, and by reason of chance the users may receive a thing of value that may be given in trade for money, credit, allowance, or a thing of value.

54.     Defendant's Game of War Casino is a "device" because Defendant caused its Game of War mobile application to be installed on mobile devices (*e.g.*, Apple iPhones or iPads) to operate as discrete terminals where players can wager Gold or Chips at a game of chance.

55.     Defendant's Game of War Casino is adapted for use to allow for the insertion of money by electronic means because a press of the "spin" button causes Chips that were purchased with cash or Gold (which, in turn, was purchased using cash) to be debited from the players' accounts and credited to Defendant.

56.     Defendant's Game of War Casino awards players things of value by reason of chance because by "spinning" a wheel, consumers are awarded things of value based upon pre-determined odds or algorithms that dictate the likelihood of winning a particular thing. Moreover, after a consumer presses the "spin" button, Defendant does not accept or require any input from consumers to award a prize. The outcome of the spin is determined entirely by chance and not by any action or skill on the part of the consumer. As such, Defendant's Game of War Casino is not a contest of skill.

57.     Defendant's Game of War Casino awards in-game items, Gold, and additional Chips, which are all things of value and/or things of value that may be given in trade for money, credit, allowance, or a thing of value. Specifically, Gold and Chips are things of value because Machine Zone offers them for sale in its electronic Gold Store, and/or are things of value that may be given in trade for

money, credit, allowance, or a thing of value because consumers can buy and sell Game of War accounts on secondary markets. (*See* Section II.D.)

58.     Defendant's Game of War Casino is not a "pinball and other amusement machine or device" as defined by Cal. Penal Code § 330b(d) because it is not predominately a game of skill. In fact, the Game of War Casino does not incorporate any skill in its gameplay. Instead, the Game of War Casino relies entirely on chance to award things of value.

59.     Plaintiff and each member of the Class have lost money as a proximate result of Defendant's violations of law and the wrongful conduct alleged herein.

60.     Plaintiff seeks an order (a) requiring Defendant to cease the unlawful practices described herein; (b) requiring Defendant to restore to Plaintiff and each Class member any money obtained through the operation of its unlawful slot machines or devices; (c) forcing Defendant to disgorge all ill-gotten revenues and/or profits; and (d) providing such other and further relief as may be just and proper.

## COUNT II
### Violation of the Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (On Behalf of Plaintiff and the Class)

61.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

62.     California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

63.     The UCL prohibits any unlawful, unfair, or fraudulent business act or practice, including the employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact. A business practice need only meet one of the three criteria to be considered unfair competition.

64.     Defendant has violated the unlawful prong of the UCL by unlawfully owning and operating "slot machines or devices" within the meaning of Cal. Penal Code § 330b(d).

65.     Defendant's unlawful conduct occurred during the marketing and distribution of its Game of War mobile game and in its sale of the Gold and Chips, and therefore occurred in the course of Defendant's business practices.

66.     Defendant's unlawful conduct directly and proximately caused Plaintiff and the Class actual monetary damages in the form of the money paid for each Game of War Casino spin (typically $0.60 per spin).

67.     But for Defendant's conduct as described herein, Plaintiff and the Class would not have spent money performing spins in Defendant's Game of War Casino.

68.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (a) requiring Defendant to cease the unlawful practices described herein; (b) requiring Defendant to restore to Plaintiff and each Class member any money acquired by means of unlawful and unfair competition (restitution); and, (c) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

### COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

69.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

70.     Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of Gold or Chips to wager at Defendant's Game of War Casino.

71.     The purchase of the Gold or Chips to wager at Defendant's Game of War Casino is and

was beyond the scope of any contractual agreement between Defendant and Plaintiff and members of the Class. To wit, Defendant's terms of service do not mention the Game of War Casino or that Game of War includes games of chance. Furthermore, the terms of service specifically prohibit the "promot[ion] or encourage[ment] [of] any illegal activity."

72.     Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

73.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendant has unjustly obtained as a result of its unlawful operation of slot machines and/or devices. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

74.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT IV**
**The Maryland Loss Recovery Statute**
**(Md. Code, Crim. Law § 12-110)**
**(On Behalf of Plaintiff and the Subclass)**

75.     Plaintiff Mason incorporates by reference the foregoing allegations as if fully set forth herein.

76.     Plaintiff and members of the Subclass are each a "Person" as defined by Md. Code, Crim. Law § 1-101.

77.     Plaintiff and members of the Subclass played Defendant's Game of War Casino game, which is a "gambling device." Maryland Code Criminal Law Section 12-101 defines "gambling device" as "a game or device at which money or any other thing or consideration of value is bet, wagered, or

gambled," including "a paddle wheel, wheel of fortune, chance book, and bingo." Md. Code, Crim. Law § 12-101.

78.     The Game of War Casino is a gambling device because consumers exchange cash for Chips (or cash for Gold and then Gold for Chips) to wager on the outcome of a spin. Moreover, the Game of War Casino is an electronic version of the popular "wheel of fortune" gaming device (also known as "big six"[20]) found in traditional casinos.

79.     In the Game of War Casino, players press the "spin" button and an animation causes a selector box to move around the device, and when the selector box stops the consumer is awarded a prize of varying degrees of value.

80.     Importantly, after a consumer presses the "spin" button, Defendant does not accept or require any input from consumers to award a prize. The outcome of the spin is determined entirely by chance and not by any action or skill on the part of the consumer. As such, Defendant's Game of War Casino is not a contest of skill.

81.     Plaintiff and members of the Subclass wagered Chips for a "spin" at Defendant's Game of War Casino because they each pressed the "spin" button which caused Chips that were purchased with cash or Gold (which, in turn, was purchased with cash) to be debited from the players' accounts and credited to Defendant.

82.     Plaintiff and members of the Subclass played at Defendant's Game of War Casino for the chance at winning valuable prizes, including additional Chips. Specifically, Gold and Chips are things of

---

[20]     *BIG SIX: A LONGITUDINAL MICRO-STUDY*, http://gaming.unlv.edu/reports/big6_study.pdf (last visited Apr. 14, 2015) (stating that "There are several variations of Big Six, a table game also known as the 'Wheel of Fortune' (it has no relation to the [] slot franchise branded after the popular game show of the same name).")

value because Machine Zone offers them for sale in its electronic Gold Store, and/or are things of value that can be traded for money or other things of value because consumers can buy and sell Game of War accounts on secondary markets. (*See* Section II.D.)

83.     Defendant is the winner of Plaintiff's and the Subclass's losses because it debited Chips from their accounts in return for "spins" and awarded Plaintiff and the Subclass their prizes.

84.     Accordingly, Plaintiff and the Subclass seek full disgorgement and restitution of any money Defendant has won from Plaintiff and the Subclass as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mia Mason, on behalf of herself and members of the Class and Subclass, prays for the following relief:

a.     Certify this case as a class action on behalf of the Class and Subclass as defined above and appoint Mia Mason as class representative and her undersigned attorneys as Class Counsel;

b.     Declare that Defendant's actions, as set out above, violate Cal. Penal Code § 330b and California's Unfair Competition Law;

c.     Award Plaintiff's and the Class's damages and/or require Defendant to restore to Plaintiff and each Class member any money acquired by means of unlawful and unfair competition (restitution);

d.     Enter judgment against Defendant in the amount of the losses suffered by Plaintiff and each member of the Subclass;

e.     Award Plaintiff and the Class reasonable costs and attorneys' fees;

f.     Award Plaintiff and the Class pre- and post-judgment interest;

g.     Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect

the interests of Plaintiff and the Class; and,

      h.     Award such other and further relief as equity and justice may require.

<strong>JURY DEMAND</strong>

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully Submitted,

**MIA MASON**, individually and on behalf of all others similarly situated,

Dated: April 17, 2015       By:  /s/ Maria C. Simon
                      One of Plaintiff's Attorneys

Maria C. Simon
MD Bar Number 17238
msimon@thegellerlawgroup.com
THE GELLER LAW GROUP
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
Tel: 703.679.7067
Fax: 703.259.8584

Rafey S. Balabanian*
rbalabanian@edelson.com
Benjamin H. Richman*
brichman@edelson.com
Amir C. Missaghi*
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro Hac Vice admission to be sought