**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MIA MASON,** | * | |
|     **Plaintiff** | * | |
|     v. | * | **CIVIL NO. JKB-15-1107** |
| **MACHINE ZONE, INC.,** | * | |
|     **Defendant** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Mia Mason ("Plaintiff") filed a Class Action Complaint against Machine Zone, Inc. ("Defendant"), producer of the popular *Game of War: Fire Age* ("*GoW*") mobile video game. Plaintiff alleges that aspects of *GoW* violate Cal. Penal Code § 330b; she seeks recovery under the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; a Maryland loss-recovery statute, Md. Code Ann., Crim. Law § 12-110; and an equitable theory of unjust enrichment. Now pending before the Court are Plaintiff's Motion for Class Certification (ECF No. 2), Defendant's Request for Judicial Notice (ECF No. 8), and Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 7).[1]

On the surface, Plaintiff charges that Defendant trampled real and important rights and interests of hers, wrongfully and unlawfully, in an alternative, virtual world created by an electronic game. But a careful probe *beneath* the surface reveals a hodgepodge of hollow claims lacking allegations of real-world harms or injuries. Perceived unfairness in the operation and outcome *of a game*, where there are no real-world losses, harms, or injuries, does not and cannot

---

[1] The issues have been briefed (ECF Nos. 7–1, 18 & 24), and no hearing is required, Local Rule 105.6 (D. Md. 2014).

give rise to the award of a private[2] monetary remedy *by a real-world court*.  Defendant's Motion to Dismiss will be GRANTED.

## *I.  Background*[3]

Defendant, a Delaware corporation headquartered in California, operates *GoW*, a "massively multiplayer" online game[4] available on Android and Apple iOS devices.  (ECF No. 1 ¶ 1.)  *GoW* is a strategy game played in real time; players construct a simulated empire comprising resource plots, buildings, troops, and a "hero."  (ECF No. 7–2 at 2.)[5]  The object is to coordinate with other players in strategic alliances so as, ultimately, to "conquer the world."  (*Id.*)

*GoW* is entirely free to play.  (ECF No. 1 ¶ 19.)  However, some players, impatient for conquest, exercise an option to purchase virtual "gold" to "improve their virtual towns and hasten their advancement in the game."  (*Id.* ¶ 2.)  Defendant maintains a digital "gold store" through which these players acquire "gold" with real money at rates ranging from $4.99 for 1200 pieces to $99.99 for 20,000 pieces.  (*Id.* ¶ 24.)  Flush with simulated cash, some of these players then proceed to the in-game "Casino," where they purchase virtual "chips" to wager on a virtual

---

[2] Plaintiff bases her primary theory of recovery on the California Unfair Competition Law ("UCL"), which authorizes actions by governmental officials such as the California Attorney General and state district attorneys as well as private actions by persons who have "suffered injury in fact and . . . lost money or property as a result of . . . unfair competition."  Cal. Bus. & Prof. Code § 17204.  Throughout this opinion, the Court limits its discussion of the UCL to the private cause of action thereunder; nothing in this opinion should be read to restrict the authority of governmental officials to pursue actions against unlawful, unfair, or fraudulent business acts or practices.

[3] The facts are recited here as alleged by Plaintiff, this being a motion to dismiss.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

[4] "Massively multiplayer" online games are complex video games involving many thousands of players and "entire worlds of activity, where people can take on and develop multiple identities, create virtual communities, and tell their own stories."  Jack M. Balkin, *Virtual Liberty: Freedom to Design and Freedom to Play in Virtual Worlds*, 90 Va. L. Rev. 2043, 2043 (2004).

[5] In a paper accompanying its Motion to Dismiss, Defendant asks the Court to take notice of (1) a printout from http://www.gowfacentral.com, a website referenced in Plaintiff's Complaint; and (2) six additional screenshots from *GoW*.  (ECF No. 8.)  In her opposition memorandum, Plaintiff states that she does not object to the printout but does object to the screenshots as she cannot verify their authenticity.  (ECF No. 18 at 37 n.22.)  Mindful that "when a defendant attaches a document to its motion to dismiss, 'a court may consider it . . . [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity,'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (alterations in original) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)), the Court will take notice of the website printout.  However, the Court will not take notice of the screenshots.

spinning wheel. (*Id.* ¶¶ 21-23.)[6] After each spin, players receive a virtual prize—ranging from an in-game "resource" such as "wood" or "stone" (useful elsewhere in the game) to additional chips or "gold." (*Id.* ¶¶ 28-29.) Plaintiff alleges that the particular outcome of each spin is predetermined by algorithms in the software and that players are more likely to win "basic items" (*e.g.*, "wood") than valuable ones (*e.g.*, "gold"). (*Id.* ¶¶ 30, 36.)

Crucially, there is no real-dollar value attached to "gold," chips, or any Casino prizes. On the contrary, Defendant's Terms of Service ("ToS")—appended to Plaintiff's Complaint— provide that "Virtual Currency and Virtual Goods may never be redeemed for 'real world' money, goods or other items of monetary value from [Defendant] or any other person"; that players receive a nontransferable "revocable license to use the Virtual Goods and Virtual Currency" solely for personal entertainment purposes; and that, aside from the foregoing license, players have "no right, title, or interest in or to any such Virtual Goods or Virtual Currency." (ECF No. 1–2 at 9.)

Although the ToS expressly bar players from "buy[ing] or sell[ing] any Virtual Currency or Virtual Goods outside the Services or in exchange for 'real world' money or items of value" (*id.* at 10), Plaintiff alleges that "players have created secondary markets to buy and sell Game of War accounts" (ECF No 1 ¶ 37). Plaintiff does not allege that Defendant hosts or sanctions these secondary markets, nor does she allege that she has ever sold or attempted to sell an account— nor even that she intends to do so in the future.

Plaintiff downloaded *GoW* in early 2014; she began playing in the Casino shortly after downloading the game. (*Id.* ¶ 43.) Plaintiff alleges that, over the course of about one year, she "lost more than $100 wagering at Defendant's Casino." (*Id.*) A citizen of Maryland, Plaintiff

---

[6] Plaintiff alleges that each spin requires at least 5000 chips—which, after the conversion from dollars to "gold" and "gold" to chips, works out to approximately $0.60 in real money per spin. (ECF No. 1 ¶ 26.)

brought this action in diversity, purporting to represent a nationwide class of players and a subclass of Maryland players. Plaintiff alleges that the Casino is an unlawful "slot machine or device" under Cal. Penal Code § 330b; that Defendant has violated California's UCL by owning and operating this unlawful device, proximately causing Plaintiff and her class economic damages; that Plaintiff and her class have conferred a benefit upon Defendant that Defendant should not be permitted to retain; and that Plaintiff and her subclass are entitled to restitution under Maryland law.

Defendant moved to dismiss the Class Action Complaint on June 29, 2015. (ECF No. 7.) Plaintiff filed a response in opposition on August 13, 2015 (ECF No. 18), and Defendant replied on September 10, 2015 (ECF No. 24).

## II.  Legal Standard

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. As the *Twombly* opinion noted, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

## III.  Analysis

### A. Cal. Penal Code § 330b (Count I)

In her Complaint, Plaintiff accuses Defendant of violating a California statute criminalizing, *inter alia*, the manufacture, ownership, or possession of a "slot machine or device." (ECF No. 1 ¶ 53.) As Defendant correctly observes in the memorandum accompanying its Motion to Dismiss, the California Penal Code "does not provide a private right of action entitling Plaintiff to sue under it." (ECF No. 7–1 at 12.) And in her opposition memorandum, Plaintiff clarifies that she does not intend to raise Count I as a distinct theory of recovery. (ECF No. 18 at 13.) Thus, the Court has no difficulty dismissing Count I for failure to state a claim.

Such dismissal does not, however, end the Court's inquiry. Plaintiff's Count II (her California UCL claim) is derivative of Count I: she bases her theory of UCL recovery on the premise that *GoW*'s Casino function is an unlawful "slot machine or device." Thus, in order to properly interrogate Plaintiff's UCL theory, the Court must consider the antecedent question whether the Casino function violates California state law.

#### *1. The Rule*

California law defines a "slot machine or device" as a "machine, apparatus, or device" that is operated by insertion of a coin or other object "or by *any other means*" and that "by reason of any element of hazard or chance" grants the user any of the following: (1) a "thing of value," (2) an "additional chance or right to use the slot machine or device," or (3) a token that may be exchanged for a "thing of value." Cal. Penal Code § 330b(d) (emphasis added).

The Casino function appears to satisfy most of these elements. While not operated by insertion of a physical coin, it is certainly operated "by any other means," and there is no dispute that—from the player's vantage point—the spinning wheel involves chance rather than skill. Moreover, while the virtual prizes that Casino players may win have no real-world economic

value,[7] section 330b appears to encompass purely in-game rewards. *See, e.g.*, *Trinkle v. Stroh*, 70 Cal. Rptr. 2d 661 (Ct. App. 1997) (flipperless pinball machines that awarded credits for free games, with better odds depending on how much money the player paid in, constituted illegal slot machines); *Score Family Fun Ctr., Inc. v. Cnty. of San Diego*, 275 Cal. Rptr. 358 (Ct. App. 1990) (arcade systems that rewarded gamers with points for extended play were illegal slot machines). The Court assumes that virtual prizes tending to advance gameplay are sufficiently analogous to the credits and points awarded in *Trinkle* and *Score Family Fun* so as to fit within the broad parameters of section 330b[8]—and Defendant does not appear to dispute this contention.

Defendant does, however, vigorously dispute Plaintiff's assertion that the Casino function is a "machine, apparatus, or device." Rather, Defendant urges, it is "software downloaded to an individual's Apple or Android device," and there is "no cognizable reading of Section 330b that would reach a software developer whose software was only installed onto the devices of others." (ECF No. 7–1 at 15-16.)[9] Plaintiff responds with citations to several cases in which California

---

[7] As noted above, the ToS provide that virtual goods and virtual currency may "never be redeemed for 'real world' money, goods or other items of monetary value." (ECF No. 1–2 at 9.)

[8] By proscribing certain games of chance that reward successful players with strictly in-game prizes, section 330b appears to reflect a legislative judgment that such games are socially undesirable—perhaps because they encourage sloth, perhaps because they whet the player's appetite for more destructive gambling activities, perhaps for other reasons. The Court notes, however, that the legislative incentives underlying section 330b may not correspond precisely with the incentives underlying other statutes relied on by Plaintiff and discussed at length below. For instance, the California UCL provides for private recovery of economic losses caused by unlawful, unfair, or fraudulent business practices. And Maryland's loss-recovery statute creates a restitution mechanism for persons who lose money while wagering at a gaming device. The UCL and the Maryland statute thus share a common purpose of redressing financial losses, while section 330b—which includes no restitution mechanism whatsoever—seems directed toward a different array of social harms. This distinction becomes important: Plaintiff here has cobbled together a Complaint by cross-referencing statutes that do not necessarily complement one another. Indeed, even were the Court to find that the *GoW* Casino function is an unlawful "slot machine or device"—it has not so found—the Court would still conclude, for the reasons discussed below, that Plaintiff has suffered no cognizable economic losses.

[9] Plaintiff draws the Court's attention to a 2014 complaint filed by the People of the State of California against a variety of individuals and entities, including Figure 8 Technologies, Inc., the corporation responsible for manufacturing some of the sweepstakes software at issue in *People ex rel. Green v. Grewal*, discussed *infra*. *See* Complaint, *People v. Figure 8 Techs., Inc.*, No. BC531997 (Cal. Super. Ct. Jan. 2, 2014). But the People alleged that Figure 8 had supplied hardware—including point-of-sale systems and user terminals—along with its software. *Id.* at 31. Moreover, as Plaintiff notes in her opposition memorandum, the *Figure 8* matter resolved with a stipulated injunction. (ECF No. 18 at 20.)

courts have found video gaming and digital sweepstakes systems to violate section 330b, but in each of these cases the systems at issue included elements of both software *and* hardware. *See, e.g.*, *People ex rel. Green v. Grewal*, 352 P.3d 275 (Cal. 2015) (integrated Internet café systems, through which customers swiped magnetic cards or entered numbers at computer terminals to play casino-style sweepstakes games, violated section 330b); *People ex rel. Lockyer v. Pac. Gaming Techs.*, 98 Cal. Rptr. 2d 400 (Ct. App. 2000) (phone card vending machines that paid out periodic cash prizes violated section 330b); *Trinkle*, 70 Cal. Rptr. 2d 661 (jukeboxes that played music and afforded users a chance to win a money jackpot violated section 330b).

Indeed, the most natural reading of the phrase "machine, apparatus, or device" calls to mind a piece of equipment, just as the phrase "slot machine" calls to mind a physical terminal with movable parts and flashing lights.[10] This natural reading is supported by linguistic authorities. *See Black's Law Dictionary* (10th ed. 2014) (defining *device* as a "mechanical invention" that may be "an apparatus or an article of manufacture" and *machine* as a "device or apparatus consisting of fixed and moving parts that work together to perform some function").

Without California precedent directing the Court to construe "machine, apparatus, or device" as encompassing software in and of itself, and guided by the principle that "unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language," *Hillman v. IRS*, 263 F.3d 338, 342 (4th Cir. 2001), the Court concludes that Defendant's interpretation is correct: *GoW*'s Casino function is not a "slot machine or device."

---

[10] Perhaps for this reason, Defendant suggests that *if* the Casino function constituted the type of gambling activity proscribed in California, "it would be the user's device itself that was made unlawful" under section 330b, a disconcerting notion given the wild popularity of *GoW*. (ECF No. 7–1 at 15.) Plaintiff retorts that "Defendant controls the software and network that supports the Casino . . . and caused Plaintiff's device to act as a 'discrete terminal' for *its* Casino." (ECF No. 18 at 20 (emphasis in original).) Plaintiff adds that "even if the phone itself was to be considered a gambling device . . . it's Defendant's own conduct . . . that rendered it as such." (*Id.* at 22.) Plaintiff's notion that Defendant is solely responsible for a game that Plaintiff volitionally downloaded to her phone seems dubious, but the Court need not resolve this particular dispute, as it concludes that the *GoW* Casino function is not an unlawful "slot machine or device."

## 2. *The Exception*

Even were the Court to embrace Plaintiff's expansive understanding of "slot machine or device," the Court would still find that Defendant has not violated section 330b. This is because, while the penal statute broadly proscribes the manufacture and ownership of such devices, it carves out an important exception: "Pinball and other amusement machines or devices, *which are predominantly games of skill*, whether affording the opportunity of additional chances or free plays or not, are not included within the [proscribed category]." Cal. Penal Code § 330b(f) (emphasis added). Here, Defendant argues, "Plaintiff's pleading and indisputable facts show that there is no dispute that GoW, as a whole, is a game of skill, not chance." (ECF No. 7–1 at 18.) Plaintiff does not refute this point directly; instead, she complains that "[u]nder Defendant's logic, any game of chance normally violating § 330b . . . can be transformed into a legal game by surrounding it with games of skill." (ECF No. 18 at 23.)

Defendant's logic would lead to no such result. The game at issue here is not "Casino"; the game is *GoW*. Plaintiff proffers no authority for the proposition that the Court may excise one particular aspect of an integrated strategy game and evaluate that aspect in isolation. On the contrary, applying Plaintiff's logic, one could excise the free replay and similar chance-based functions of any number of skill-based games—including pinball—and, viewing those aspects in isolation, find the games to violate section 330b. In essence, Plaintiff invites the Court to read the subsection (f) exclusion out of the statute. The Court declines Plaintiff's invitation.[11]

---

[11] Plaintiff separately argues that the section 330b(f) exclusion is limited to those games through which the player wins nothing of value other than free games for amusement purposes. Plaintiff supports her proposition with a cite to an older case, *Knowles v. O'Connor*, 71 Cal. Rptr. 879 (Ct. App. 1968). *Knowles* did not actually impose such a limitation: it simply recognized that a *particular* amusement device, which happened to reward successful players with free games, was predominantly a game of skill. In any event, because the *GoW* Casino function awards nothing more than virtual resources tending to enhance gameplay, it fits comfortably within the bounds of the section 330b(f) exclusion *even as* construed by Plaintiff.

Because *GoW*'s Casino function is not a "slot machine or device," and because the game—properly viewed as a whole—is predominantly a game of skill, *GoW* does not violate section 330b.

### B. California UCL (Count II)

Under the UCL, any person who engages in "unfair competition," defined to include "unlawful, unfair or fraudulent business act[s] or practice[s]," Cal. Bus. & Prof. Code § 17200, may be enjoined from such acts/practices and required to relinquish any money or property acquired unfairly, § 17203.  To advance a UCL claim, a private-party plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice . . . that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011) (emphasis in original).  A plaintiff who has received the benefit of his bargain has "no standing under the UCL." *Johnson v. Mitsubishi Dig. Elecs. Am., Inc.*, 365 F. App'x 830, 832 (9th Cir. 2010).  Moreover, "hypothetical or conjectural damages without more are insufficient to support a claim under the UCL." *Mashiri v. Vital Recovery Servs., Inc.*, No. 14-cv-00231-BAS (BLM), 2014 WL 4249800, at *5 (S.D. Cal. Aug. 27, 2014).

#### 1. Standing

As a preliminary matter, it appears that Plaintiff lacks standing to assert a claim under the UCL.  *Tidenberg v. BIDZ.com, Inc.*, No. CV 08-5553 PSG (FMOx), 2009 WL 605249 (C.D. Cal. Mar. 4, 2009), is instructive.  The *Tidenberg* court explained that a Texas resident with a claim of Internet-based misrepresentation could proceed under the UCL only if (1) her injury occurred *in* California or (2) the defendant's alleged misconduct transpired *in* California.  *Id.* at *4.  As for prong one, Tidenberg presumably accessed the defendant's website from her home in Texas; as

for prong two, Tidenberg's allegation that the defendant had its principal place of business in California was insufficient for the court to presume that the misrepresentation emanated from that state. *Id.*; *see also Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1056 (N.D. Cal. 2013) (explaining that the mere fact defendant was headquartered in California did not establish that its alleged misconduct—kickbacks and backdating—emanated from California).

Plaintiff's UCL claim is rooted in similarly shaky ground. Plaintiff is not a California resident; she does not allege that she downloaded or played *GoW* in California; and the sole connection she has drawn between Defendant and California is the fact that Defendant is headquartered there.[12] That is precisely the type of connection that *Tidenberg* found inadequate. Furthermore, the cases Plaintiff cites in her opposition memorandum serve only to highlight the weakness of her claim. *Compare In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 917-18 (C.D. Cal. 2011) (nonresident plaintiffs lacked standing where they failed to allege with sufficient detail that promotional literature at issue was disseminated from California), *with Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1132 (N.D. Cal. 2014) (nonresident plaintiff alleged a sufficient nexus with California where she claimed that "misrepresentations were developed in California, contained on websites and an application that are maintained in California, and . . . billing and payment of services went through servers located in California").

Thus, on the face of her Complaint, it does not appear that Plaintiff has alleged adequate factual content to satisfy the UCL's standing requirements.

### 2. *Economic Injury*

---

[12] In her opposition memorandum, Plaintiff posits that she has standing because Defendant's allegedly unlawful conduct "occurred in and emanated from California." (ECF No. 18 at 28.) The Court finds this assertion curious. In her Complaint, Plaintiff had alleged that the United States District Court for the District of Maryland has personal jurisdiction over Defendant because Defendant "conducts significant business transactions in this District, and because the wrongful conduct occurred in *and emanated from* this District." (ECF No. 1 ¶ 8 (emphasis added).) Plaintiff, it seems, would have her cake and eat it too.

Even if Plaintiff could show that she has standing to bring a UCL claim, that claim would still fail because she has not alleged an economic injury attributable to Defendant's purported misconduct.

Plaintiff argues that there is "no question that [she] suffered an economic injury by wagering in the Casino" because she "lost $100 between early 2014 and January 2015," typically "$0.60 per spin." (ECF No. 18 at 18.) But of course Plaintiff was not wagering with *dollars*; she was playing with *virtual gold*. Plaintiff acquired that "gold" in the "gold store," where she exchanged her real-world currency for a nontransferable, revocable license to use virtual currency for entertainment purposes. (ECF No. 1–2 at 9.) At the moment of that antecedent transaction, Plaintiff's "loss," if any, was complete: then and there she had swapped something of value (real money) for something of whimsy (pretend "gold").

Plaintiff could spend her "gold" as she pleased within the bounds of Defendant's ToS: she could acquire resources to "hasten [her] advancement in the game" (ECF No. 1 ¶ 2), or she could exchange her "gold" for chips to spin the Casino wheel (*id.* ¶ 21).[13] What she could *not* do is cash out of the game. In this respect, while *GoW*'s Casino function aesthetically resembles classic games of chance, the underlying transaction is more akin to purchasing cinema or amusement park tickets. Consumers of such services pay for the pleasure of entertainment *per se*, not for the prospect of economic gain.

Plaintiff separately argues that she was deprived of the benefit of her bargain because, "in purchasing Gold and thereafter wagering Chips, Plaintiff entered into a bargain for the opportunity to play what she believed was a *legal* video game," but what she received instead

---

[13] As Defendant observes, "the GoW Casino is unlike a real world casino in that GoW players never lose and no 'house' ever wins." (ECF No. 7–1 at 10.) Rather, each spin produces one of several prizes. In purely virtual terms, some prizes may seem more attractive than others—but Plaintiff does not allege that the system ever malfunctioned or otherwise deceived her.

11

was "the opportunity to unknowingly utilize an 'illegal game of chance.'" (ECF No. 18 at 27 (emphasis in original).)

Plaintiff is begging the question. The legality of *GoW* is precisely what this Court has been asked to determine, and as discussed in Part III.A, *supra*, the Court has concluded that the game does not violate California's Penal Code. Moreover, the technical illegality of a transaction—where the consumer has received the full economic benefit of her bargain—will not trigger a private cause of action under the UCL. *See Peterson v. Cellco P'ship*, 80 Cal. Rptr. 3d 316, 322 (Ct. App. 2008) (where plaintiffs alleged that defendant retained a portion of their insurance premiums as an unlawful commission, but where plaintiffs did not allege that they overpaid for the insurance because of such commission or that they could have otherwise acquired the policy for a lower price, plaintiffs did not articulate sufficient economic injury under the UCL).

Having failed to allege a concrete economic injury, Plaintiff cannot state a claim under the UCL.

### 3. *Public Policy*

Finally, even had Plaintiff alleged a cognizable injury—which she has not—the Court would still be inclined to dismiss her claim on public policy grounds. California maintains a "broad, strong policy against judicial resolution of civil claims arising out of gambling contracts or transactions." *Kelly v. First Astri Corp.*, 84 Cal. Rptr. 2d 810, 826-27 (Ct. App. 1999); *see also Jamgotchian v. Sci. Games Corp.*, 371 F. App'x 812, 813 (9th Cir. 2010) (applying *Kelly* in finding that plaintiff's action to unwind certain betting transactions and recover related losses violated public policy). Thus, per Plaintiff's own theory of the case—*i.e.*, that *GoW*'s Casino

function is an unlawful "slot machine or device" and that Plaintiff suffered monetary losses by wagering on such device—she is barred from recovering as a matter of California public policy.[14]

Because Plaintiff has not plausibly alleged an actual economic loss stemming from unlawful, unfair, or fraudulent business acts or practices, Count II must be dismissed.

### C. *Unjust Enrichment (Count III)*

In Count III, Plaintiff alleges that she "conferred a benefit upon Defendant in the form of the money Defendant received" through her in-game purchases and that under "principles of equity and good conscience, Defendant should not be permitted to retain the money . . . which Defendant has unjustly obtained as a result of its unlawful operation of [the Casino]." (ECF No. 1 ¶¶ 70, 73.) Plaintiff does not indicate whether her unjust enrichment claim arises under Maryland or California law, although per the choice-of-law provision in Defendant's ToS, the claim is properly construed under California law.[15]

California courts are divided as to whether unjust enrichment even exists as a discrete cause of action. *Compare McBride v. Boughton*, 20 Cal. Rptr. 3d 115, 121 (Ct. App. 2004)

---

[14] Plaintiff insists that California courts will aid parties in enforcing gambling contracts if a statute authorizes recovery. In support of her proposition, Plaintiff cites language in *Kelly* quoting a much earlier opinion, *Wallace v. Opinham*, 165 P.2d 709 (Cal. Dist. Ct. App. 1946). *Wallace* did recognize that a party who acts illegally and thereby suffers losses may recover where he has a "remedy under the particular provisions of some statute." *Id.* at 710 (emphasis omitted) (quoting *Babcock v. Thompson*, 20 Mass. (3 Pick.) 446, 449 (1826)). However, *Wallace* also clarified that "[n]o California statute authorizes a party to an illegal transaction which is prohibited by law to recover gambling losses," *id.*, a point reiterated by *Kelly*, 84 Cal. Rptr. 2d at 827 ("The Legislature has not enacted a statute permitting the use of the process of the courts in California to resolve the kind of gambling loss claims asserted in [the plaintiff's] complaint."). Plaintiff here identifies no case in which a court has allowed a gambling-loss claim to proceed under the UCL, and at least one court expressly barred such a claim. *See Alves v. Players Edge, Inc.*, No. 05CV1654 WQH (CAB), 2007 WL 6004919 (S.D. Cal. Aug. 8, 2007).

[15] The choice-of-law provision indicates that the "[t]erms and any action related thereto will be governed by the laws of the State of California without regard to its conflict of law provisions." (ECF No. 1–2 at 12.) While a claim for unjust enrichment—a quasi-contractual theory—can be distinguished from a claim relating to the ToS, the Fourth Circuit has recognized that the "scope of . . . choice-of-law provisions . . . being a matter of contract interpretation, must be determined by the law of the state chosen by the parties in the contract." *Bunker Holdings, Ltd. v. Green Pac. A/S*, 346 F. App'x 969, 973 (4th Cir. 2009) (per curiam). In California, "a valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses *all causes of action* arising from or relating to that agreement, regardless of how they are characterized." *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1155 (Cal. 1992) (in bank) (emphasis added). Thus, here, Plaintiff's unjust enrichment claim would appear to arise under California law.

("Unjust enrichment is not a cause of action . . . or even a remedy, but rather 'a general principle, underlying various legal doctrines and remedies[.]'" (quoting *Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347, 357 (Ct. App. 2003)), *with Lectrodryer v. SeoulBank*, 91 Cal. Rptr. 2d 881, 883 (Ct. App. 2000) (defining unjust enrichment as "receipt of a benefit and unjust retention of the benefit at the expense of another"), *and Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (explaining that when a plaintiff alleges unjust enrichment, a court may construe the allegation as a quasi-contract claim for restitution).

Assuming *arguendo* that unjust enrichment is cognizable in California, Plaintiff has failed to state a claim for essentially the same reason that she failed to articulate a loss under the UCL: Plaintiff paid for the privilege of playing with Defendant's in-game currency, and she got precisely what she bargained for.[16] Under such circumstances it is not unjust for Defendant to retain the funds it received from Plaintiff; on the contrary, it would be unjust to return those funds to Plaintiff after she benefited from the enhanced gaming experience that "gold" evidently delivers. *Cf. Comet Theatre Enters., Inc. v. Cartwright*, 195 F.2d 80, 83 (9th Cir. 1952) ("There is no equitable reason for invoking restitution when the plaintiff gets the exchange which he expected.").[17]

### D. Md. Code Ann., Crim. Law § 12-110 (Count IV)

Finally, Plaintiff seeks to recover under Md. Code Ann., Crim. Law § 12-110, a loss-recovery statute. Section 12-110(a) provides that a person who "loses money" at a prohibited "gaming device" may "recover the money as if it were a common debt." A separate provision

---

[16] Plaintiff also reiterates her claim that she "bargained for the use of a legal video game" but received instead an "unlawful gambling device." (ECF No. 18 at 36.) As noted above, Plaintiff is merely begging the question. Aside from this conclusory assertion, Plaintiff does not explain how the virtual currency she purchased differed from what was promised to her, nor does she demonstrate that she was somehow shortchanged when playing in the Casino.

[17] An identical result would obtain under Maryland law, which defines unjust enrichment to include three elements: (1) a "benefit conferred upon the defendant by the plaintiff"; (2) an "appreciation or knowledge by the defendant of the benefit"; and (3) the "acceptance or retention by the defendant of the benefit under circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007).

14

defines "gaming device" to include a "game or device at which money or any other thing or consideration of value is bet, wagered, or gambled." § 12-101(d)(1). The parties here differ over the meaning of the phrase "bet, wagered, or gambled,"[18] but even applying Plaintiff's preferred definition—*i.e.*, gambling involves elements of "consideration, chance and reward"—Plaintiff has failed to state a claim under the Maryland statute for the simple reason that she did not lose money while playing in the Casino. Rather, as discussed at length above, any "loss" that Plaintiff sustained occurred when she volitionally chose to spend real-world dollars in exchange for a nontransferable, revocable license to play with virtual currency in a virtual world.

Plaintiff insists that real-world casinos operate by converting cash into chips. (ECF No. 18 at 34.) True enough. But casinos also convert chips *back into cash*. It would be the rare gambler indeed who would enter a casino, bent on "chance and reward," only to purchase chips that he could never redeem.

Plaintiff presents two additional arguments in footnotes: neither is availing. First, Plaintiff states that the "Chips and Gold [she] lost had *actual real world value* by merit of their ability to be sold and exchanged" (*id.* at 35 (emphasis in original)), ostensibly on the secondary market. However, as is clear from the face of Plaintiff's Complaint, there is no secondary market for chips and "gold" *per se*; rather, players may (in breach of contract with Defendant) list their *accounts* for sale or trade (ECF No. 1 ¶¶ 37-42). Even assuming that Casino activity may theoretically diminish the secondary value of a player's account,[19] that entirely separate

---

[18] No reported Maryland cases construe this particular phrase in the context of a section 12-110 claim. Defendant points to a Fourth Circuit interpretation of a South Carolina gambling statute, where the court explained that "[i]n a wager, each party has a chance of gain and takes a risk of loss." *United States v. Lawson*, 677 F.3d 629, 654 (4th Cir. 2012) (alteration in original) (quoting *State v. GNLV Corp.*, 834 P.2d 411, 413 (Nev. 1992)). Plaintiff counters with a definition applied by the Court of Appeals of Maryland in a case involving seized slot machines. There, the court recognized that gambling involves three elements: "consideration, chance and reward." *State v. One Hundred and Fifty-Eight Gaming Devices*, 499 A.2d 940, 951 (Md. 1985).

[19] In Plaintiff's Complaint, she alleges that she spent more than $100 on "gold," which she thereafter exchanged for chips to spin the Casino wheel. (ECF No. 1 ¶ 43.) However, Plaintiff conveniently neglects to identify which

(and forbidden) transaction plainly does not constitute money lost at a gaming device within the meaning of section 12-110.  What is more, Plaintiff nowhere alleges that she sold or attempted to sell her account on the secondary market, nor even that she intends to do so in the future. Plaintiff's mere speculation about a hypothetical economic injury cannot support her claim for restitution under Maryland law; for that matter, such speculative claims are often dismissed as nonjusticiable under Article III. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) ("'[T]hreatened injury must be *certainly impending* to constitute injury in fact,' and . . . '[a]llegations of *possible* future injury' are not sufficient." (alteration and emphases in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))).

Second, Plaintiff posits that every time she wagered chips, she "took on the risk that [she] would receive something of lesser value."  (ECF No. 18 at 35 n.19.)  But none of the prizes on offer in the *GoW* Casino have *any* freestanding value apart from their contribution to gameplay. Plaintiff's theory, if taken seriously, would place an eventual factfinder in the unenviable position of pricing the conversion from virtual gold and chips to virtual wood and rock.  Such a whimsical undertaking may spark the imaginations of children and ardent game enthusiasts, but it can have no place in federal court.

## IV.  Conclusion

At the outset of her Complaint, Plaintiff alleges that with free-to-play games of chance, "developers have begun exploiting the same psychological triggers as casino operators."  (ECF No. 1 ¶ 12.)  The Court does not doubt that gambling addiction is a real phenomenon and that the allure of an elusive jackpot can be powerful.  Similarly powerful, the Court suspects, is the remorse a buyer may feel when she realizes that she has wittingly swapped her hard-earned cash

---

Casino prizes she won.  For all the Court can tell from the face of the Complaint, Plaintiff may have won a pile of "wood"—or a "gold" jackpot.

for simulated gold. The Court does not sit in judgment of the entertainment choices that Plaintiff and others like her have made—but it will not allow Plaintiff to foist the consequences of those choices onto an entertainment purveyor that, at least on the face of this Complaint, appears to have done nothing wrong.

Plaintiff thinks that this case is about recovering modest payments she and fellow putative class members were improperly persuaded to make while playing an illegal online game. The allegations do not withstand scrutiny. Instead, the case ends up being more about the need to draw clear and distinct lines between real and virtual worlds, particularly when it comes to the serious business of going to court and litigating real claims and interests. Even in the Internet age, there is a crucial distinction between that which is pretend and that which is real and true.[20]

The Court is keenly aware that evolving technologies generate novel questions and that these questions sometimes give rise to thorny cases. This case, however, is at bottom a simple one. The laws of California and Maryland do not trifle with play money, and so Plaintiff's Complaint must be dismissed. Accordingly, an Order shall enter GRANTING IN PART and DENYING IN PART Defendant's Request for Judicial Notice (ECF No. 8), GRANTING Defendant's Motion to Dismiss (ECF No. 7), and DENYING AS MOOT Plaintiff's Motion for Class Certification (ECF No. 2).

---

[20] In closing, the Court expresses its disapproval of lawsuits—like this one—that strain and strain but in the end never credibly allege an injury. This was a dubious action arising from an assortment of statutes and legal theories that, in the end, never coalesced. This kind of pleading lends credence to a negative view held by many about the legal profession, succinctly expressed in a maxim widely attributed to Justice Oliver Wendell Holmes, Jr.: "[L]awyers spend a great deal of their time shoveling smoke." *Miller v. United States*, 531 F. Supp. 2d 70, 71 (D.D.C. 2008). Federal dockets are crowded enough with credible allegations of true harms. Parties with righteous claims—and righteous defenses to such claims—are forced to place their lives on hold for months and sometimes years as they await their turn to be heard. Lawsuits like this one needlessly add to the delay in resolving truly legitimate disputes.

DATED this 20th day of October, 2015.

BY THE COURT:

/s/
James K. Bredar
United States District Judge